**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

GERALD FULLER                                                    *

Plaintiff                                                              *

v                                                                       *                    Civil Action No. WMN-15-2469

WEXFORD HEALTH SOURCES, INC., et al. *

Defendants                                                        *

***

**MEMORANDUM**

On May 16, 2016, this Court directed Plaintiff Gerald Fuller to respond to Defendants'

Motion to Strike and for Sanctions.  ECF 27 and 28.  Fuller filed a Motion for Extension of Time

seeking a 90 day extension to respond to the Motion to Strike and to prepare a Motion for

Injunctive Relief.  ECF 29.  On June 8, 2016, Fuller filed a Response to Show Cause Order.

ECF 30.  Thus, Fuller's motion for extension of time shall be denied as moot.

Fuller initially claimed that the handwritten statement on Defendants' copy of his May

10, 2016 affidavit (ECF 26) stating, "I may be released soon.  Do I have to take this matter out

on the streets? Can we resolve this and I go my way and you go your[s]?" was simply an offer to

settle this case.  He characterizes counsel's security concerns regarding the statement as bizarre

and delusional and suggests that "there is mental illness or substance abuse present."  ECF 29.

He offers as a basis for his request for a 90 day extension of time the need for additional time to

research the motion filed by Defendants and indicates that he "may be starting a jury trial on

May 23, 2016" on an unrelated matter.  *Id*. at p. 2.  He further claims that Defendants "recently

attempted to murder" him by taking control of his blood pressure medication, causing his blood

pressure to rise to levels of 225/122.  *Id*.

In his Response to Show Cause Order, Fuller claims the handwritten note was a note to

himself reminding him to make an offer to settle this case because he may be released soon. ECF 30 at p. 3, ¶ 8.  He claims that the inclusion of the handwritten note was inadvertent and was caused by the fact that he is forced to prepare legal documents in a cramped, poorly lit prison cell. *Id*. at p. 4, ¶ 7.  Notwithstanding that claim, Fuller finds fault with opposing counsel's neglect to "record the actual place and condition the said note was found" and maintains that had counsel done so, that information would exculpate Fuller from any suspicion of communicating a threat.  *Id*. at p. 4, ¶¶ 3 and 4.  Fuller then asserts that "a sustainable argument could be made that the note is a plant by the Defendants to circumvent Plaintiff's rights and meritorious cause of action."  *Id*. at p. 5, ¶ 9.  He concludes that the allegation is bizarre and reaching and maintains that Defendants have actively sought to cause him harm.  *Id*. at ¶ 10.

The handwritten statement sent to counsel for Defendants is threatening.  It takes little to no inference to discern that Fuller's offer to "take this matter out on the streets," coupled with the statement that he may be released soon, is a threat.  His dismissal of this characterization, as well as his attempt to insult counsel's presence of mind, simply underscores his lack of appreciation for the seriousness of the matter at issue. In addition, Fuller's attempt to both admit the note was written by him for some other purpose and also suggest that the note is some sort of subterfuge manufactured by counsel to obfuscate the issues sub judice is specious.

Given Fuller's lack of remorse or anything approaching regret for the inclusion of the threatening handwritten note, Defendants' Motion to Strike shall be granted in part and Fuller's affidavit on which the threat was written will be stricken from the record and will not be considered as a part of Fuller's Opposition Response.  Fuller is admonished by the Court for the use of threatening language and he is forewarned that any future incidents of this nature in any other case will result in the dismissal of any complaints he has pending in this Court.

Fuller's request for a 90 day extension of time to file a Motion for Injunctive Relief will be denied. Fuller has adequately responded to Defendants' Motion to Dismiss or for Summary Judgment and the documents already filed, with the exception of ECF 26, will be considered by the Court in the following dispositive review of the claims asserted.

Defendants filed a Motion to Dismiss or for Summary Judgment on December 23, 2015. ECF 9. Plaintiff sought and was granted two Motions for Extension of Time to file an Opposition Response. ECF 12 and 20. Following the first Motion for Extension of Time, Fuller filed Motions for Default Judgment (ECF 14 and 17), to Grant Relief (ECF 16), and for Specific Orders or Other Appropriate Relief (ECF 24). The Motions for Default Judgment and to Grant Relief were denied (ECF 21) and the Motion for Specific Orders remains pending. Fuller filed an Opposition Response on February 5, 2016 ( ECF 18), which he supplemented (ECF 22, 23, 25 and 26). As stated, the affidavit docketed as ECF 26 shall not be considered. In light of the extensive filings made by Fuller, the undersigned is satisfied that he has had a full and adequate opportunity to respond to Defendants' motion. The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons that follow, the Defendants' motion, construed as a Motion for Summary Judgment, shall be granted and judgment entered in their favor.

### Plaintiff's Claims

Fuller alleges he suffers chronic pain and claims that on three occasions over a period of 9 to 12 months prior to the filing of the instant complaint, his medications were either not properly ordered or stolen leaving him in debilitating pain. ECF 1 at p. 4.

Since 2011, after being emergently sent to Peninsula Regional Hospital, where he was admitted to intensive care for eight days, Fuller states he has had unstable and chronically low

potassium levels, causing frequent urination during the night (12 to 15 times) and resulting in fatigue and dehydration. *Id*. He claims that while he was at Patuxent Institution from June 2013 to March 2014, the cause of the low potassium was being investigated and he was seeing a nephrologist, but when he was returned to North Branch Correctional Institution (NBCI) his appointments were terminated and his potassium supplements were increased. *Id*. He asserts he is still "getting up anywhere from 5 to 12 times a night urinating." *Id*. Fuller adds that Wexford Health Sources, Inc. ("Wexford") "approved [his] transfer back to the care of NBCI's provider." ECF 1-1 at p. 4.

Fuller claims that the combination of his frequent need to urinate and the arthritis he suffers in his fingers, hands and wrist, makes him unable to control the direction of his urine flow. This, he claims, creates an issue with his cellmates who become angered over being awakened by frequent flushing of the toilet and the "stench arising from urin[e] all over the place." ECF 1 at p. 4. Despite Fuller's reports that disputes with cellmates regarding this issue have come to "near blows," he states that medical staff have refused to renew an order for his assignment to a single cell. *Id*. He states that he is 62 years old and the only thing that has prevented his injury from assault thus far is his size and weight. *Id*. He further explains it takes an "hour or two" after awakening for him to be able to use his hands. *Id*.

Fuller alleges that "[r]ecently my bones all over started hurting very bad." ECF 1 at p. 4. He claims that he was unable to exercise due to the pain he was experiencing; his teeth "started breaking up;" and his medication was spontaneously terminated. *Id*. He states that "[w]hile cleaning the dust from my fan, I discovered the dust was turning the water red." *Id*. He alleges that "staff" have not tried to determine why the dust in his cell was turning the water red, nor has medical staff tried to determine if it had anything to do with his increased pain. *Id*. Fuller

further asserts that when he filed a sick call slip, his blood pressure was high and he had a "high temperature." *Id.*

Fuller states that in addition to body-wide arthritis and frequent urination, he also suffers from hepatitis C, high blood pressure, hypokalemia, hyperlipidemia, and macular degeneration. He also states he has a plantar's wart on his foot and "Dr. Wahboob" gave Fuller antibiotic cream and told him to hold his foot in the air to treat the plantar's wart. *Id.* He states he takes 12 different medications on a daily basis. Fuller describes himself as a writer and a known jailhouse lawyer, but claims he has experienced so much pain and fatigue that he cannot concentrate. *Id.* He further explains that when he walks, he is walking on painful knees and a painful plantar's wart as well as arthritic ankles and shins. *Id.* He claims that when he submits sick call slips, he is seen by a nurse who cannot do anything or he is seen by Dr. Ashraf, who does not listen to Fuller and tells Fuller he cannot do anything unless Bill Beaman, the Nursing Supervisor, approves it. *Id.*

Fuller claims that in the summer of 2008, he was provided with "knee injections" and cane to assist in walking. ECF 1-1 at pp. 4 – 5. He was also given "rotator cup surgery on his shoulder." *Id.* at p. 5. He states that as his nighttime urination issue worsened, the arthritis worsened and spread to his hands and arms. *Id.* Fuller further claims his blood pressure increased with the increase in his arthritic pain and he was put on a calcium blocker, which appeared to further aggravate the condition of his hands, wrist, arms, and neck. *Id.* He states he is now in continuous pain, can no longer close his hands, and cannot direct his stream of urine adequately. *Id.* He maintains that the arthritic condition renders him unable to defend himself against cellmates who become irate about the urine being all over the cell. *Id.* Fuller states that

the animosity generated may result in either he or his cellmate being injured and if the latter

occurs, it will mean his further needless incarceration.

### Defendants' Response

Defendants Wexford Health Sources, Inc., Dr. Colin Ottey, Dr. Mahboob Ashraf,

Jeanette Clark, N.P., and William Beeman, Nursing Supervisor, allege that Fuller has received

adequate medical care for all of his complaints and that his urinary frequency issue is not a basis

for a medically assigned single cell. ECF 9. Additionally, Defendants note that any claims

related to medical provider services predating July 1, 2012, were not the responsibility of

Wexford Health Sources, Inc., as it was not the contracted healthcare provider for the Division of

Correction prior to that date. *Id.* With regard to Fuller's specific medical complaints Defendants

provide the following information.

Fuller's medical history is noted to include degenerative arthritis, degenerative joint

disease, uncontrolled hypertension (high blood pressure), hyperlipidemia (abnormally high

concentration of fats in the blood), and hyperkalemia (low potassium). ECF 9 at Memorandum,

p. 3, *see also* ECF 9 at Ex. 1 (Affidavit of Robustiano Barrera, M.D.). Defendants note that

Fuller has a history of poor compliance with prescribed medications and has refused to come in

for medical visits on numerous occasions. *Id.*, *see also* Ex. 2 at pp. 2 (July 3, 2012 no show due

to court trip), 146 (July 14, 2012 refused sick call), 147 (September 3, 2012 refused x-ray of

right knee), 149 (October 9, 2012 refused sick call), 150 (October 23, 2012 refused sick call),

151 (November 5, 2012 refused medication), 157 (June 10, 2013 refusal of Hydralazine), 159

(October 28, 2014 refused sick call), 160 (October 28, 2014 left sick call to play basketball), 161

(March 19, 2015 refused blood draw), 165 (April 24, 2015 refused mechanical soft diet), 166 –

67 (May 25, 2015 sick call refused "patient went to yard"), and 168 – 69 (June 15, 2015 refused

sick call).  Fuller is seen regularly in chronic care clinics for his various medical conditions and

is seen approximately every six days for clinic visits, as well as in response to sick call slips he

submits. ECF 9 at Ex. 1.  Defendants assert that between July 3, 2012 and September 12, 2015,

Fuller was seen 181 times and his full medical record is greater than 1600 pages in length.  *Id.*

In one of the chronic care clinics, Fuller is treated for his chronic degenerative arthritis

and degenerative joint disease. Defendants assert that Fuller's arthritis does not impact his ability

to complete activities of daily life independently and note he is able to climb and descend stairs,

complete errands around the prison, complete cooking activities, dress himself, and is able to

squat, kneel and stand from a seated position.  Fuller is prescribed Tramadol,[1] aspirin, Tylenol,

Baclofen,[2] steroid injections, Indomethacin,[3] Methylprednisolone[4], and prednisone[5] for treatment

of pain related to arthritic conditions.   In addition, he has been provided with medical

assignments to a bottom bunk, bottom tier housing, and has been provided with a cane and a

medical order for front handcuffing.  ECF 9 at Ex. 1.

Fuller was seen by an orthopedic specialist, Dr. Roy J. Carls, on October 1, 2015. *See id.*

at Ex. 2, pp.123 – 24, 128 – 29, and 145.  Dr. Carls noted that Fuller did not appear to be in acute

distress and was in good physical condition.  His knees demonstrated full extension and flexion

---

[1]     Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.
http://www.drugs.com/search.php?searchterm=tramadol

[2]     Baclofen is a muscle relaxer and an antispastic agent.
http://www.drugs.com/search.php?searchterm=baclofen.

[3]     Indomethacin is a nonsteroidal anit-inflammatory drug (NSAID) that works by reducing hormones that
cause inflammation and pain in the body.  http://www.drugs.com/search.php?searchterm=indomethacin&a=1.

[4]     Methylprednisolone is a steroid that prevents the release of substances in the body that cause inflammation
and is used to treat many different inflammatory conditions including arthritis.
http://www.drugs.com/search.php?searchterm=methylprednisolone&a=1.

[5]     Prednisone is a corticosteroid. It prevents the release of substances in the body that cause inflammation. It
also suppresses the immune system. http://www.drugs.com/search.php?searchterm=prednisone&a=1.

back to 130 degrees, but crepitus and swelling was observed in both knees with the swelling being greater in the right knee. Dr. Carls recommended treating Fuller with Synvisc[6] injections, or other similar treatment, but noted the best long-term solution for Fuller's right knee was a total knee replacement (arthroplasty). *Id.* at p.145. At the time Defendants filed their motion, the consultation request for the injections was still pending. ECF 9 at Ex. 1. Fuller has received injections to his knees in the past. *Id.* at Ex. 2, pp. 14 (August 8, 2012) and 94 (March 14, 2015).

Fuller is also seen in a chronic care clinic for treatment of hypokalemia. He is provided with potassium supplements to treat the condition, but has been non-compliant with treatment on several occasions. His potassium levels are checked and have been within normal limits with the exception of one occasion which was attributed to Fuller's failure to take the potassium supplements provided. With respect to Fuller's treatment by a nephrologist, Defendants state he was seen on three occasions: November 26, 2013; January 20, 2014; and March 27, 2014.

On November 26, 2013, tests were ordered for plasma renin[7] levels, twenty-four hour potassium urine, and for aldosterone[8] levels. In addition, an MRI of the adrenal gland was ordered and Fuller was prescribed potassium supplements. ECF 9 at Ex. 2, p. 142. The tests for aldosterone levels and twenty-four hour urine were performed on December 3, 2013, and discussed with Fuller on December 18, 2013. *Id.* at pp. 45, 47 – 49. The plasma renin test was not performed, but sent back to the laboratory for testing. At this time, Fuller's potassium level

---

[6]     Synvisc is similar to the fluid that surrounds the joints in your body. This fluid acts as a lubricant and shock absorber for the joints. http://www.drugs.com/synvisc.html.

[7]     Renin is a protein (enzyme) released by special kidney cells when you have a decreased salt (sodium) level or low blood volume. https://www.nlm.nih.gov/medlineplus/ency/article/003698.htm.

[8]     "Aldosterone is a hormone released by the adrenal glands. It helps the body regulate blood pressure. Aldosterone increases the reabsorption of sodium and water and the release of potassium in the kidneys. This action raises blood pressure. Aldosterone blood test is often combined with other tests, such as the renin hormone test, to diagnose over- or under-production of aldosterone." https://www.nlm.nih.gov/medlineplus/ency/article/003704.htm.

was within normal limits.  *Id*.  The MRI was performed on December 27, 2013, and revealed no masses or abnormalities.  *Id*. at pp. 63 – 65.

On January 20, 2014, Fuller was seen again by the nephrologist who determined that his hypertension medication should be adjusted.  Fuller's prescriptions for Hydralazine[9] and Verapamil[10] were increased and Diovan[11] was added.  ECF 9 at Ex. 2, pp. 54 – 55.  A 24 hour urine test for proteins and serum protein electrophoresis was ordered and on February 25, 2014, the lab work revealed Fuller's potassium level was within normal limits and urine protein was elevated.  *Id*. at pp. 143; 208 – 209.

On March 27, 2014, during Fuller's visit with the nephrologist, he offered no urinary complaints and his medications were renewed.  ECF 9 at Ex. 2, p. 144.  Because Fuller's potassium levels were consistently within normal limits, it was determined that he did not need to continue treatment with the nephrologist.  *Id*.  Lab work for Fuller's condition continued to be monitored and he was provided potassium supplements to ensure his potassium levels stayed within normal limits.  *Id*. at pp. 183 – 231.[12]  To treat Fuller's polyuria (excessive excretion of urine) he was prescribed Flomax.[13]  *Id*. at pp. 98 – 100.  Defendants assert that polyuria is not a

---

[9]     Hydralazine is a vasodilator that works by relaxing the muscles in your blood vessels to help them dilate (widen). This lowers blood pressure and allows blood to flow more easily through the veins and arteries. It is prescribed  for treatment of  high blood pressure (hypertension). http://www.drugs.com/search.php?searchterm=hydralazine.

[10]     Verapamil is a calcium channel blocker. It works by relaxing the muscles of the heart and blood vessels. It is prescribed to treat hypertension (high blood pressure), angina (chest pain), and certain heart rhythm disorders. http://www.drugs.com/search.php?searchterm=verapamil&a=1.

[11]     Diovan or Hydrochlorothiazide is a thiazide diuretic (water pill) that helps prevent the body from absorbing too much salt, which can cause fluid retention. It keeps blood vessels from narrowing, which lowers blood pressure and improves blood flow.   http://www.drugs.com/search.php?searchterm=diovan.

[12]     Pages 170 through 231 of Exhibit 2 to ECF 9 are all lab reports.

[13]     Flomax (tamsulosin) is an alpha-blocker that relaxes the muscles in the prostate and bladder neck, making it easier to urinate.  It is prescribed to improve urination in men with benign enlarged prostate. http://www.drugs.com/search.php?searchterm=Flomax&a=1.

condition that warrants a medical order requiring Fuller to be assigned to a single cell.  ECF 9 at

Ex. 1.

With regard to Fuller's allegation that he had a plantar's wart on his foot that was not

treated properly, Defendants assert that Fuller was seen on February 13, 2013, by Defendant

Colin Ottey, M.D. At that time, Fuller had a callous on his right foot which Dr. Ottey treated

through soaking in an Epsom salt bath and shaving the callous.  Additionally, Dr. Ottey ordered

gel shoe inserts for Fuller.   ECF 9 at Ex. 2, pp. 34 – 36.  Fuller was also seen on December 4,

2014, by Nurse Practitioner Clark for removal of a plantar's wart on his left foot.  *Id*. at pp. 84,

87 – 88.  The wart was removed with a scalpel, cleaned, and covered with a bandage.  *Id*. On

June 4, 2015, it was noted that Fuller had recurring plantar warts that had left a callous on his

foot.  *Id*. at p. 106.

Fuller's medical order for a cane was reconsidered on December 1, 2014, when Fuller

was seen by Clark for a scheduled provider visit.  Clark noted that Fuller had been seen walking

to the room in the mornings without his cane and observed that on this occasion Fuller was

walking to the medical room holding his cane with the tip barely touching the ground.  It was

further noted that Fuller was able to get on and off the examination table without difficult or

assistance of his cane.  During this visit, Fuller dropped the cane and Band-Aids on the floor and

he was able to bend over and pick both up without difficulty or assistance.  Although Fuller had

been provided a knee brace for support, he was not wearing it during this visit.  Since Fuller did

not appear to be unsteady on his feet it was concluded he did not require a cane to walk.  ECF 9

at Ex. 2, pp. 84 – 86.  Subsequent requests made by Fuller for a cane were denied because there

was no evidence that he had difficulty walking or that his gait was unsteady. *See id*. at pp. 91 –

93 (February 17, 2015 request to Clark, denied based on no evidence of need); pp.101 – 105

(May 5, 2015 request to Dr. Ashraf, decision delayed pending consult with other providers); pp. 109- 111 (June 9, 2015 request denied based on discussion with other providers).

Fuller's multiple requests for a medical order requiring his assignment to a single cell were also denied. On November 6, 2014, when Fuller was seen by N.P. Clark and his recent lab work, revealing his potassium levels were normal, was reviewed, he requested a single cell due to his frequent need to urinate. ECF 9 at Ex. 2, pp. 82 – 83. When Fuller reported he had difficulty controlling the stream of his urine due to his arthritis, he was advised to sit during urination. *Id.* Clark noted that Fuller was not a candidate for a single cell and advised him to wrap his hands with warm, wet rags in the morning and to use bundled socks to squeeze throughout the day to maintain strength and flexibility. *Id.* On June 9, 2015, Fuller submitted a sick call slip requesting a medical order for a single cell and was seen by Dr. Ashraf. *Id.* at pp. 109 -111. Ashraf noted that Fuller had been informed on multiple occasions that a single cell was not medically indicated. *Id.*

**Plaintiff's pending motion**

Fuller's Motion for Specific Orders (ECF 24) seeks an Order from this Court requiring Wexford Health Sources to provide him access to review his electronic medical records to establish that on two trips out of the prison for purposes of attending court proceedings, he was not provided with adequate medication for his hypertension. He states that on December 5, 2015, and on January 25 through 26, 2016, he did not receive his medication, resulting in his blood pressure rising to 215/122. *Id.* at p. 2. Fuller claims he was "without medication for several days," that he was seen at Jessup Correctional Institution (JCI), and he ran out of medication while at Maryland Correctional Training Center (MCTC). *Id.* He claims the only

time treatment was attempted was while he was at JCI. *Id*. He concludes that these records establish an ongoing deliberate indifference to his serious medical needs. *Id*.

Fuller also asserts that he requires more time in the prison law library and requests that this Court order the warden to allow him more time to perform legal research and permitting Fuller to "collect electronically stored legal reference material to word processing disk that he may take back to his cell to read and research." *Id*. at p. 3. In the alternative, Fuller asks that this Court excuse him from "the requirement of citing relevant case citation." *Id*.

Fuller's request regarding access to medical records is in the nature of a discovery request. Federal Rule of Civil Procedure 56(d) provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1) Defer considering the motion or deny it;
>
> (2) Allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts

essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008).

The claim that Fuller asserts the sought after records prove is not a claim raised in this Complaint. Whether he was deprived of prescribed medications on the two occasions noted does not establish that the claims he raises in the Complaint are meritorious or that Defendants are not entitled to summary judgment in their favor on those claims. Given there is no nexus between the material Fuller seeks and the issues pending before this Court, the motion seeking production of those records shall be denied.

In addition, Fuller's request for an Order requiring the warden to provide him with more time to research legal issues relevant to this case shall be denied. As noted, Fuller sought and was granted extensions of time to file an Opposition Response and he has opposed the

dispositive motion through multiple pleadings filed.  Additionally, this Court does not require

legal citation by self-represented litigants.

**Standard of Review**

Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,

Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

14

Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue

of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized

by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th

Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).  In order to state an Eighth

Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the

defendants or their failure to act amounted to deliberate indifference to a serious medical need.

*See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard

– a showing of mere negligence will not meet it. ... [T]he Constitution is designed to deal with

deprivations of rights, not errors in judgments, even though such errors may have unfortunate

consequences. .. To lower this threshold would thrust federal courts into the daily practices of

local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed to either provide it or ensure the

needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the

medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992)

(there is no expectation that prisoners will be provided with unqualified access to health care).

Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious

medical condition. *See Farmer*, 511 U.S. at 839в 40.  "True subjective recklessness requires

knowledge both of the general risk, and also that the conduct is inappropriate in light of that

risk.@ *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness

on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference

'because prison officials who lacked knowledge of a risk cannot be said to have inflicted

punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995)

quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official

may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately

averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in

light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390

(4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on

precautions actually taken in light of suicide risk, not those that could have been taken).

**Analysis**

In Fuller's first Opposition Response (ECF 18) he submits an affidavit detailing lapses in

medication during court trips taking place during January of 2016. As previously noted, these

claims were not raised in the Complaint filed in this case and will not be addressed here.

Regarding the claims that were raised in the Complaint, Fuller reiterates his claim that "the

medical investigation" to determine why he experienced a "sudden potassium collapse" was

abandoned by Wexford staff following his transfer to NBCI from Patuxent. ECF 18-1 at pp. 3 –

4. He claims his blood pressure medication was discontinued while he was hospitalized in 2011

and that on January 26, 2016, Dr. Barrerra prescribed 90 days of Lasix, a powerful diuretic,

without reviewing Fuller's medical history. *Id*. at p. 4. Fuller's characterization of the medical

decision to discontinue his care by a nephrologist is refuted by the objective evidence provided

by Defendants. As such, the claim constitutes his disagreement with the course of care chosen

by medical staff and does not offer a basis for a constitutional claim. The right to treatment is

"limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis in original).

In Fuller's Affidavit dated February 21, 2016, he states that the nephrologist who was treating him for hyperkalemia told him he should not take diuretics until the cause of the hyperkalemia is determined. ECF 22[14] at p. 2. He further states he has not been allowed access to the 2011 hospitalization records to establish this order was written. *Id.* Fuller claims that despite that order, Dr. Barrerra prescribed Lasix for him on January 28, 2016, and Fuller brought it to the attention of the medication nurse that he was not supposed to take that medication. *Id.* at pp. 2 – 3. Fuller alleges that the "medical officials" at NBCI appear "to be wholly of European American" descent while "the overwhelming prisoner population is Black/descendants of slaves." *Id.* at p. 3. He claims that prisoners are "treated as slaves" and alleges the prisoners and their families are forced to subsidize the cost of incarceration through purchase of costly items from vendors such as winter clothing and food to supplement the food provided by the prison. *Id.*

This Court will not address Fuller's commentary regarding race relations or his beliefs regarding the economic arrangements between prison vendors and the families of prisoners as it has no relevance to the claims at issue in this case. Fuller's claim regarding prescribed diuretics is, again, a disagreement with medical care prescribed. Defendants have provided records indicating that Fuller's potassium level is stable and there is no indication that prescription diuretics caused Fuller to become hyperkalemic. In fact, the nephrologist who was treating Fuller prescribed a diuretic as part of the prescription drug treatment for his condition. *See* ECF 9 at Ex. 2, p. 54 (Diovan prescribed by nephrologist January 30, 2014). Failure to pinpoint a

---

[14]     Fuller's affidavit docketed as ECF 23 is identical in content to ECF 22.

cause for the hyperkalemia which required his hospitalization over five years ago, is not a basis for a constitutional claim.

Fuller attaches an administrative remedy procedure (ARP) complaint to the affidavit which includes a response from the warden finding his complaint meritorious. ECF 22-1. In the ARP Fuller complains that his pain medication ran out on January 4, 2016, and the response indicates that the provider did not complete all of the paperwork necessary for the renewal. *Id*. At most, the response demonstrates negligence on behalf of the unknown staff member who did not fill out the proper paperwork. Mere negligence or malpractice does not rise to a constitutional level. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

It is clear from the record before the Court that Fuller is receiving treatment for his multiple medical issues. While the medical care provided may not be exactly what Fuller believes is necessary, e.g., a medical order for a single cell and a cane, the care provided is constitutionally adequate. The standard for establishing a viable Eighth Amendment claim regarding medical care requires proof of conduct that shocks the conscience. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). The deliberate or reckless disregard required for such a claim is not evidenced where, as here, regular treatment that includes blood tests, urine tests, multiple medications, and diagnostic tests are provided. While this Court does not indorse a practice that apparently permits lapses in prescribed medication because of bureaucratic failures, it is not the role of this Court to correct such deficiencies absent actual harm. While Defendants are entitled to summary judgment in their favor on the facts of this case, they are well-advised to address those deficiencies in order prevent future harm from occurring.

Finally, this Court notes that Fuller's pending Public Information Act request addressed to the Warden of NBCI (*see* ECF 30-1), appears to be his attempt to establish there are other prisoners who have not received proper medical care at NBCI which has resulted in their deaths. That information does not appear to be subject to disclosure under Maryland's Public Information Act as it concerns confidential medical information regarding other people.  Even assuming that information could be produced and considered in the context of this case, it is not relevant to Fuller's claim regarding his care.  Lastly, Fuller has no standing to assert claims on behalf of other prisoners.

A separate Order entering judgment in favor of Defendants follows.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: June 20, 2016